## MATTER OF CHURCH SCIENTOLOGY INTERNATIONAL

### In Visa Petition Proceedings

### A-26781336

*Decided by Commissioner March 15, 1988*

(1) A person seeking a Schedule A, Group IV, labor certification must meet all eligibility requirements for "L-1" classification as a manager or executive, including those relating to a qualifying relationship between the entities for which the person has been and would be employed.

(2) In view of congressional intent that the "L-1" provisions be used for personnel transferred by international businesses, any religious personnel who are able to meet all the same "L-1" requirements which apply to business or other personnel may be granted "L-1" visas or Schedule A, Group IV, labor certifications.

(3) Ownership and control are the factors for establishing a qualifying relationship between entities for purposes of "L-1" classification.

(4) Ownership refers to the direct or indirect legal right of possession of the assets of an entity with full power and authority to control.

(5) Control means the direct or indirect legal right and authority to direct the establishment, management, and operations of an entity.

ON BEHALF OF PETITIONER:  Jerald B. Serviss
Barst & Mukamal
One Wilshire Building
624 South Grand Avenue, Suite 2620
Los Angeles, California 90017

Mark A. Mancini
Wasserman, Mancini & Chang
1724 H Street, N.W.
Washington, D.C. 20006

The director, Western Regional Service Center, denied the sixth-preference immigrant visa petition and certified his decision to the Commissioner for review. The Commissioner affirmed the director's decision.

Counsel now moves the matter be reconsidered. The matter will be reconsidered. The decisions of the director and the Commissioner will be affirmed.

The petitioner is the Mother Church of the Church of Scientology. It seeks the beneficiary's services as an establishment executive.

The petitioner claims the beneficiary is eligible for a Schedule A, Group IV, labor certification under 20 C.F.R. § 656.10(d)(1) (1988). That regulation relates to an alien in the United States who was admitted to the United States to work in, and is currently working in, a managerial or executive position with the same international corporation or organization with which he or she was continuously working as a manager or executive for 1 year immediately prior to admission. For 1 year prior to her admission to the United States, the beneficiary worked as a deputy commanding officer for tours for the Church of Scientology, Inc. in Sydney, Australia.

The director and the Commissioner both determined the beneficiary does not qualify for a Schedule A, Group IV, labor certification. This is based on their findings that the United States and foreign entities are not part of the same international corporation or organization for purposes of such a labor certification.

Counsel seeks reconsideration on the following four grounds:

(1) The petitioner (the Mother Church of a hierarchical religion) and the foreign entity (another church of the same religion) satisfy the requirements of a qualifying affiliate relationship because of the nature of ecclesiastical control in a hierarchical religion.

(2) The test and standards of proof applied to the petitioner are arbitrary and capricious.

(3) Denial of the petition constitutes religious discrimination in violation of the due process and equal protection clauses of the fifth and fourteenth amendments to the United States Constitution.

(4) Denial of the petition violates the first amendment to the Constitution.

Although the beneficiary was found ineligible for a Schedule A, Group IV, labor certification on the ground that the United States and foreign entities are not part of the same international corporation or organization, there is another issue in this proceeding which was not previously explored. This issue is whether or not the beneficiary is eligible for such a labor certification as a manager or executive. Each issue will be addressed separately.

## QUALIFYING RELATIONSHIP BETWEEN THE UNITED STATES AND FOREIGN ENTITIES

*Applicability of "L-1" standards to Schedule A, Group IV*

A person seeking a Schedule A, Group IV, labor certification must meet *all* eligibility requirements for "L-1" nonimmigrant

intra-company transferee classification as a manager or executive pursuant to section 101(a)(15)(L) of the Immigration and National-ity Act, 8 U.S.C. § 1101(a)(15)(L) (1982), including those relating to a qualifying relationship between the entities for which the person has been and would be employed. Title 20 C.F.R. § 656.22(f)(1) (1988) states:

Aliens seeking labor certifications under Group IV of *Schedule A* shall meet, at the time of filing the application, the eligibility requirements of the Immigration and Nationality Act for an L-1 nonimmigrant visa classification as a manager or an executive.

Similarly, the Department of Labor's *Technical Assistance Guide, No. 656, Labor Certifications* (1981) ("TAG"), provides on pages 14 and 15:

The only aliens who qualify for Group IV of Schedule A are those in *executive* or *managerial* positions who can qualify to enter the United States under an "(L)" visa.

In an advisory opinion dated January 10, 1986, contained in the record of proceeding, the Department of Labor reasserts its view that this is the correct standard for Schedule A, Group IV.

*Criteria for a qualifying relationship between entities*

Case law has confirmed that ownership and control are the fac-tors for establishing a qualifying relationship between United States and foreign entities for purposes of "L-1" classification. *Matter of Siemens Medical Systems, Inc.,* 19 I&N Dec. 362 (Comm. 1986); *Matter of Hughes,* 18 I&N Dec. 289 (Comm. 1982); *see also Matter of Tessel, Inc.,* 17 I&N Dec. 631 (Acting Assoc. Comm. 1981). Accordingly, to establish the existence of such a relationship, a pe-titioner must demonstrate ownership and control.

Ownership refers to the direct or indirect legal right of posses-sion of the assets of an entity with full power and authority to con-trol. Control means the direct or indirect legal right and authority to direct the establishment, management, and operations of an entity. See the definitions of the terms "ownership" and "control" in the Immigration and Naturalization Service Operations Instruc-tions 214.2(1)(4). *See also Matter of Hughes, supra.* While an entity is usually in the form of a corporation, partnership, or sole propri-etorship and is either a profit or nonprofit organization, the nature and form of the entity are not relevant. *Johnson-Laird, Inc. v. INS,* 537 F. Supp. 52 (D. Or. 1981).

The ownership and control of both entities must be the same for a finding of a same employer, parent/subsidiary, or affiliate rela-tionship, as required by the statute. In each case, the Service must

determine whether the same individual(s) or organization owns enough of the assets of both entities to enable the individual(s) or organization to control the management and operations of both entities.

*Qualifying relationship between religious organizations*

The "L–1" classification was originally created for business, not religious, personnel. House of Representatives Report No. 91–851 (which accompanied Public Law 91–225 (1970) when the "L–1" provisions were first enacted into law) states the purpose of the "L–1" provisions is to facilitate the admission of "key personnel" and "managerial personnel" of international businesses. H.R. Rep. No. 851, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 2750. According to the report:

> This amendment would help eliminate problems now faced by American companies having offices abroad in transferring key personnel freely within the organization. This proposal would meet the objectives of American industry which has been seriously hampered in transferring personnel.

*Id.* at 2754.

The report, however, makes no mention of religious organizations. The Service does not believe that Congress intended "L–1" visas to be used by employees of religious organizations. There are other statutory and regulatory provisions to facilitate the entry of persons engaged in religious activities.

Nonetheless, the lack of a provision for employees of religious organizations to obtain "L–1" visas does not preclude their obtaining these visas if they are otherwise qualified. The following interpretation of the Department of State specifically indicates they are allowed to do so:

> An organized religious, charitable, service, or other nonprofit organization is considered to be '. . . a firm or corporation or other legal entity or an affiliate or subsidiary thereof . . .' for purposes of section 101(a)(15)(L) of the Act.

Vol. 9, Foreign Affairs Manual, Part II, 22 C.F.R. § 41.67 note 2.9 ("FAM").

The main thrust of counsel's argument is that a hierarchical religion such as that of the Church of Scientology, in which the Mother Church exercises control over the theology and doctrines of other Scientology churches, has the necessary qualifying relationship between its entities to meet the requirements for "L–1" classification. Counsel argues further that, since members of a religious organization, unlike stockholders in a business enterprise, do not own any property, ecclesiastical and doctrinal control, not owner-

ship, should be the standard for determining whether or not there is a qualifying relationship between religious entities.

Additionally, counsel submits a copy of an unpublished Service decision (NYC–N–109090) where a qualifying structural link between two separate Catholic religious orders was found for purposes of "L–1" classification based on the fact that the transfer of the beneficiary (a Roman Catholic nun) required and received the administrative approval of the Vatican bureaucracy. Counsel also notes the standards for determining qualifying relationships between entities have, in the past, varied from case to case.

The Service, in the absence of any legislative history, regulations, or precedent decisions on the applicability to religious personnel of the "L–1" and Schedule A, Group IV, provisions, has been attempting to set standards and may have inadvertently rendered some inconsistent decisions. In spite of this, this Service is not required to approve applications or petitions where eligibility has not been demonstrated, merely because of prior approvals which may have been erroneous. *Matter of Khan,* 14 I&N Dec. 397 (BIA 1973), by extension; *Matter of M–,* 4 I&N Dec. 532 (BIA 1951; BIA, A.G. 1952); *see also Pearson* v. *Williams,* 202 U.S. 281 (1906); *Lazarescu* v. *United States,* 199 F.2d 898 (4th Cir. 1952); *United States ex rel. Vajta* v. *Watkins,* 179 F.2d 137 (2d Cir. 1950); *Mannerfrid* v. *Brownell,* 145 F. Supp. 55 (D.D.C.), *aff'd,* 238 F.2d 32 (D.C. Cir. 1956).

In view of the congressional intent that the "L–1" provisions be used for personnel transferred by international businesses, the only appropriate standards for determining "L–1" eligibility are those applied to businesses. Accordingly, this Service withdraws from the decision in NYC–N–109090 involving a Roman Catholic nun (mentioned above) and any other prior "L–1" or Schedule A, Group IV, decisions which apply other standards. Since personnel of religious organizations are not precluded from obtaining "L–1" visas or Schedule A, Group IV, labor certifications, any religious personnel who are able to meet the same "L–1" requirements which apply to business or other personnel may be granted these benefits.

With reference to NYC–N–109090, it should be noted that evidence of the Vatican's administrative approval of the beneficiary's transfer, in and of itself, does not establish the existence of a qualifying relationship between the two religious orders. Based upon a review of the narrative decision only and without reference to the record of proceeding in that case, it is not possible to determine whether or not the petition met the standards articulated here for a qualifying relationship between the relevant entities.

Applying the same standards to all business, religious, and other personnel is the only fair way to adjudicate "L–1" and Schedule A,

Group IV, cases. These standards apply equally to personnel of all religions (whether newly established or older) seeking the benefits in question.

*Type of qualifying relationship claimed in this proceeding*

The Immigration and Nationality Act does not define the terms "subsidiary" and "affiliate," but new "L-1" regulations defining these terms went into effect March 30, 1987, after this petition was filed. The new regulations do not reflect a change in Service policy. They merely codify definitions already set forth in administrative case law. *See Matter of Siemens Medical Systems, Inc., supra; Matter of Hughes, supra.*

Title 8 C.F.R. § 214.2(l)(1)(ii)(K) (1988), effective March 30, 1987, states:

'Subsidiary' means a firm, corporation, or other legal entity of which a parent owns, directly or indirectly, more than half of the entity and controls the entity; or owns, directly or indirectly, 50% of a 50-50 joint venture and has equal control and veto power; or owns, directly or indirectly, less than half of the entity, but in fact controls the entity.

Title 8 C.F.R. § 214.2(l)(1)(ii)(L) (1988) states:

'Affiliate' means one of two subsidiaries both of which are owned and controlled by the same parent or individual or one of two legal entities owned and controlled by the same group of individuals, each individual owning and controlling approximately the same share or proportion of each entity.

The record in this proceeding attempts to establish the existence of an affiliate relationship between the petitioning Mother Church and the foreign entity. Since it is asserted that the Mother Church controls the subordinate foreign entity in Australia, the actual question in this case is whether a parent/subsidiary relationship exists.

*Counsel's citations from the TAG and FAM*

In a brief dated August 16, 1985, counsel argues the United States and foreign entities constitute a qualifying association within the meaning of the following discussion of Schedule A, Group IV, on page 13 of the TAG:

For Group IV purposes, corporations and organizations shall also include associations, firms, partnerships, joint ventures, joint stock companies, affiliates, and subsidiaries, but shall not include relationships which are only licensor-licensee or franchisor-franchisee.

This citation from the TAG explains the types of entities which may have qualifying relationships. It does not mean that all such entities qualify for purposes of Schedule A, Group IV. Further-

more, the Commissioner's decision found no evidence establishing the existence of a qualifying association.

In the brief dated August 16, 1985, and in the motion to reconsider, counsel advances the argument that the United States and foreign entities in question, as "an organized religious . . . organization," are part of the same international organization within the meaning of the State Department interpretation from the FAM cited previously. In the motion, counsel takes issue with the Commissioner's conclusion that components of international churches have qualifying relationships no more automatically than do components of international commercial enterprises. Counsel argues the FAM merely requires the religious, charitable, or service organization to be organized. According to counsel, if the organization is organized, no further examination is necessary to determine affiliation.

Nevertheless, as in the case of the above citation from the TAG, the excerpt from the FAM simply explains that religious, charitable, and service organizations may have qualifying relationships for purposes of "L-1" nonimmigrant intra-company transferee classification. It does not mean that all organizations of this type qualify for purposes of "L-1" and Schedule A, Group IV, benefits.

## The Church of Scientology and the Roman Catholic Church

Counsel asserts the hierarchical structure of the Church of Scientology is similar to, if not identical to, that of other longer established hierarchical religions, where the Service has recognized qualifying relationships between entities for purposes of "L-1" classification. Specifically, counsel asserts "the parallels between the Roman Catholic Church and the Church of Scientology are particularly strong." While the Mother Church of Scientology controls the doctrine and theology of local Scientology churches, review of the evidence in the record does not support counsel's proposition.

The Church of Scientology does exhibit some of the same characteristics as the Roman Catholic Church. Both religions have similar structures in that both have separately incorporated individual units. Both also have hierarchies consisting of nonprofit entities. Consequently, neither has stock ownership or accrual of profits. In spite of these similarities, the two hierarchies must be compared with profit-making organizations in many other respects in order to determine ownership of assets and control of the entities.

The petitioner has submitted, as a sample of a typical incorporation in the Roman Catholic Church, a copy of an amendment of the articles of incorporation of a Roman Catholic bishop (designated as

a corporation sole) changing its jurisdiction and changing its name to that of an archbishop. Comparison of this document with a copy of the constitution and general rules of a typical Scientology church reflects markedly different control of the subordinate entities.

The sample document indicates that a Roman Catholic bishop or archbishop incorporates a diocese or archdiocese on authority and under order or proclamation of the Pope. The Pope has sole authority to appoint or remove the bishop or archbishop. It is the Pope who entrusts the bishop or archbishop with the corporate powers to manage and operate the diocese or archdiocese under rules, regulations, and disciplines of the Roman Catholic Church, just as the parent corporation of a business enterprise appoints a board of directors to manage and operate its subsidiaries according to its rules, regulations, and philosophy. In addition, the Pope has authority to change jurisdictions and names of dioceses and archdioceses and to create new ones.

Thus, not only does the Pope have control over theological doctrines, but he also has control over the assets, management, and operations of each diocese or archdiocese, as well as control over bishops and archbishops. A bishop or archbishop, as shown in the sample document, is designated as a corporation sole. Therefore, the Pope also indirectly owns the assets of the diocese or archdiocese.

*Black's Law Dictionary* (5th ed. 1979) states:

> A corporation sole is one consisting of one person only, and his successors in some particular station, who are incorporated by law in order to give them some legal capacities and advantages, particularly that of perpetuity, which in their natural persons they could not have had.

The sample document reflects that a bishop or archbishop (the corporation sole) is "authorized to hold, own and administer properties." Since the Pope may appoint, promote, or remove the person who is designated as the corporation sole or change his jurisdiction, the Pope indirectly owns the corporation sole's property.

On the other hand, the foreign entity (local church) in Australia in this case is subject only to the theological and doctrinal control of the petitioning Mother Church. Although a trustee must be a duly ordained minister of Scientology in good standing with the Mother Church, whose tenure may be terminated for failure to continue in this status, the members of the Board of Trustees of the foreign entity are elected by local church members or other trustees. They manage the foreign entity's own affairs and elect other church officers.

While the foreign entity must follow the doctrines of the Mother Church and contract with it for trademarks, products, literature, and services used in the practice of Scientology, there is a major distinction between its theological and corporate relationship with the Mother Church. Unlike the Roman Catholic hierarchy, where the Pope alone has the authority to create and change jurisdictions of dioceses and archdioceses, the foreign entity can be dissolved by a majority of four-fifths of the votes at a general meeting.

Notwithstanding counsel's assertion that all religious organizations are based on voluntary participation, the Church of Scientology in Sydney, Australia, according to its constitution and general rules, is bound by the hierarchical structure of the international organization only through a *voluntary and self-determined agreement* which is not present in the Roman Catholic Church. Such an agreement does not establish control of one entity by the other.

Similarly, notwithstanding counsel's assertion to the contrary, approval by the Mother Church of transfers of personnel from one church entity to another, in and of itself, does not establish the existence of a qualifying relationship between entities. As noted above, this is equally true in the case of the Roman Catholic nun (NYC-N-109090), discussed previously.

In addition, the agreement for services between the Mother Church and the foreign entity clearly provides for binding arbitration, under the auspices of the Los Angeles office of the American Arbitration Association, of disputes between the two entities. The license agreement between them also provides for arbitration. In the Roman Catholic Church, however, the Pope is the supreme pastor, supreme legislator, and supreme judge.

Other distinctions between the Church of Scientology and the Roman Catholic Church are that, unlike the Roman Catholic Church, the Mother Church of Scientology does not own, either directly or indirectly, or control any of the assets of the foreign entity. Moreover, the Mother Church does not ordain local church ministers. Rather, the assets are owned locally and ordinations are performed, and may be revoked, by the local church. Accordingly, the petitioning Mother Church clearly does not own or have the ultimate legal right to control the local church.

The relationship between the Mother Church and the foreign entity is, in business terms, that of a franchisor/franchisee, not a parent/subsidiary relationship. According to *Black's Law Dictionary:*

> In its simplest terms, a franchise is a license from [the] owner of a trademark or trade name permitting another to sell a product or service under that name or mark. More broadly stated, a 'franchise' has evolved into an elaborate agreement

601

under which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor, and the franchisor undertakes to assist the franchisee through advertising, promotion, and other advisory services.

In this case, the petitioning Mother Church provides continuous religious guidance to the local church, gives training to its ministers, and ensures the standardization of its doctrines and practices, much as a franchisor in the business world would guide, give training to and regulate a franchisee. The local church, which is locally owned and solely responsible for acquiring trustees and church officers and managing its affairs, may likewise be compared with the independently owned business of a franchisee.

The Mother Church and the foreign entity are joined by a license agreement and an agreement for services. The Mother Church and the religious Technology Center (another Scientology organization) own and control, by trademarks and service marks, the products, literature, and services used in the practice of Scientology. The Mother Church and the Religious Technology Center permit the foreign entity to use them under the terms of a license. A contractual relationship of this type is not considered to be a qualifying relationship for purposes of "L–1" classification. *See Matter of Schick*, 13 I&N Dec. 647 (R.C. 1970).

The above discussion cannot be construed to mean that there is a qualifying relationship between all organizations associated with the Roman Catholic Church, or that there is not a qualifying relationship between the Church of Scientology and its other associated organizations. Such a determination is made on a case-by-case basis after considering the petitioner's evidence of ownership and control.

*Test and standards of proof applied to the petitioner*

Counsel argues the test and standards of proof applied to the petitioner are arbitrary and capricious. In considering the nature of relationships between religious entities for purposes of "L–1" classification, the Service, while applying law and regulation equally, must examine organizational structure and relevant factors. As with nonreligious entities, this must be accomplished by reviewing the documentary evidence of record.

In each case, all evidence must be evaluated, and there is no presumption of eligibility. The fact that some religious entities may be able to establish qualifying relationships while others are not able to do so may lead to the erroneous conclusion asserted by counsel that the findings are subjective opinions relating to individual peti-

tioners. This is not the case. Varying opinions should be expected where diverse structures are found.

The tests and standards of proof utilized in this proceeding have been clearly established through regulation and administrative case law, as discussed at length above. The record demonstrates that all due consideration has been accorded the petitioner in accordance with current Service policy.

## Constitutional issues

Counsel also claims that denial of the petition raises constitutional issues. Counsel does not, however, claim that the statute is unconstitutional. Of course, the Service cannot pass upon the constitutionality of the statute it administers. Nevertheless, we can address questions relating to the constitutionality of its application. Since all petitioners who seek "L-1" or Schedule A, Group IV, benefits must qualify on the same basis regardless of their religion, no violation of the equal protection or due process clauses can be found.

Counsel argues that the Service has denied the petitioner a mechanism for bringing its personnel to the United States, thereby violating the free exercise clause. The fact is the Service treats all religions the same. Whether or not religious employees qualify for "L-1" classification on merits not relating to religious preference or practice is a different matter.

Counsel asserts that the Service's review of the petitioning religion's internal organization is a violation of the establishment clause. *Matter of Brantigan,* 11 I&N Dec. 493 (BIA 1966), holds that, in visa petition proceedings, the burden of proof to establish eligibility for the benefit sought rests with the petitioner. In carrying out its obligation to ensure compliance with the congressional intent of the immigration laws, the Service must examine the organizational structure of an entity seeking "L-1" or Schedule A, Group IV, benefits in order to determine whether or not it has met its burden of proof. This does not violate the establishment clause.

## MANAGERIAL OR EXECUTIVE CAPACITY

As in the case of the definitions of the terms "subsidiary" and "affiliate," the new "L-1" regulations, effective March 30, 1987, define qualifying managerial and executive capacities. The definitions of "managerial capacity" and "executive capacity" also do not reflect a policy change. As noted on February 26, 1987, when the new regulations were published, "The standards included the pro-

posed regulations were intended to clarify the Service's interpretation of the statute and current regulations, not to make a change in policy." 52 Fed. Reg. 5739 (1987).

Generally speaking, under either the old or new regulations, two factors identify a qualifying managerial or executive capacity, as defined in 8 C.F.R. §§ 214.2(l)(1)(ii)(A) and (B) (1987), now cited at 8 C.F.R. §§ 214.2(l)(1)(ii)(B) and (C) (1988), and both must be present. First, the position must involve significant authority over generalized policy of an organization or a major subdivision of an organization. Second, the employee's duties must be primarily at the managerial or executive level. An employee who primarily performs the tasks necessary to produce a product or to provide services is not considered to be employed in a managerial or executive capacity. Moreover, a managerial or executive employee must have authority over day-to-day operations beyond the level normally vested in a first-line supervisor.

Having discretionary authority and a managerial or executive title (such as establishment executive and deputy commanding officer for tours) does not, in and of itself, mean a person is employed in a managerial or executive capacity. Here, the beneficiary's positions for both the United States and foreign entities have managerial or executive titles and discretionary authority.

While working for the foreign entity, the beneficiary was responsible for a staff of 20, including 2 division heads, but she also "wrote programs which she implemented" to ensure that Church policy was followed regarding "dissemination tours for Church expansion." This appears to be the function of a staff officer or specialist not usually performed by a manager or executive. In her current position with the petitioning United States entity, the beneficiary is responsible for running an entire division, but she supervises only five other employees.

The record does not contain sufficiently detailed descriptions of the beneficiary's job duties, the job duties of her subordinates, and the organizational structures at her job sites to determine whether her employment is in a qualifying managerial or executive capacity. This issue was not raised in prior decisions. As the petition is otherwise not approvable, it does not need to be addressed further. It is simply noted for the record.

## CONCLUSION AND ORDER

For the reasons discussed above, the decisions of the director and the Commissioner will be affirmed. This action is without prejudice to consideration of a new sixth-preference visa petition accompa-

nied by a labor certification based upon a specific job offer pursuant to 20 C.F.R. § 656.21 (1988).

This action also does not preclude a finding of a qualifying relationship between the petitioner and a foreign entity which it owns and controls. The Church of Scientology, as with all other religious or nonreligious organizations, may secure "L-1" or Schedule A, Group IV, benefits for its employees when all requirements of the statute and related regulations are met.

ORDER: The decision of May 29, 1986, dismissing the appeal is affirmed.